UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| FROEDTERT MEMORIAL LUTHERAN HOSPITAL, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>CVS HEALTH CORPORATION, CAREMARKPCS HEALTH, LLC, CAREMARK, LLC d/b/a CVS SPECIALTY, WELLPARTNER, LLC, and JOHN DOES 1-15,<br><br>Defendants. | : | **COMPLAINT**<br><br>Case No. ______________________<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Froedtert Memorial Lutheran Hospital, Inc. ("Plaintiff"), by and through its attorneys, Frier Levitt, LLC, by way of this Complaint against Defendants CVS Health Corporation ("CVS Health"), CaremarkPCS Health, LLC ("CaremarkPCS"), Caremark, LLC d/b/a CVS Specialty ("Caremark LLC" or "CVS Specialty"), WellPartner, LLC ("WellPartner"), and John Does 1-15 (collectively, "Defendants"),[1] hereby alleges the following:

## PRELIMINARY STATEMENT

1. Congress enacted the 340B Drug Pricing Program to provide financial support to community hospitals, federally-qualified health centers, and other safety net providers that serve a significant number of low-income and uninsured patients. These "Covered Entities"[2] under the

[1] Plaintiff and Defendants are referred to throughout as the "Parties."

[2] In the 340B Program, a "Covered Entity" is a healthcare provider or organization that meets specific criteria and is therefore eligible to purchase outpatient drugs at discounted prices. These entities include hospitals, Federally Qualified Health Centers, and other safety-net providers. They must register with the HRSA's Office of Pharmacy Affairs ("OPA") and comply with program requirements to purchase medications at the discounted 340B price.

340B Program are entitled to receive discounts on drug costs from drug manufacturers, which enables them to utilize the savings from those discounts to fund their charitable mission of providing quality medical care to the underserved and in need ("340B Savings").

2. Covered Entities realize the 340B Savings through the model of using Pharmacy Benefit Managers ("PBMs") like CaremarkPCS to bill health plans and insurance carriers for 340B-eligible claims. Covered Entities are able to purchase drugs at the "340B discount" from drug manufacturers, in connection with 340B eligible claims. The difference between that discounted acquisition cost and the fair market value reimbursement PBMs pay to Covered Entities for such drugs (the "340B Savings"), provides the "margin" necessary to stretch scarce federal resources and fund indigent care.

3. Defendants CVS Health, CaremarkPCS (the PBM), and their vertically-integrated pharmacies Caremark LLC d/b/a CVS Specialty have conspired to redirect a substantial portion of these 340B Savings to themselves. By surreptitiously diverting funds, Defendants prevent the critical 340B revenue from reaching Covered Entities, in turn negatively impacting their ability to serve indigent and un-insured patients—the intended beneficiaries of the 340B Program.

4. Plaintiff is a 340B Covered Entity that operates an acute care hospital in eastern Wisconsin. Due in part to PBM network restrictions that require patients to receive specialty drugs at specific and limited specialty pharmacies, Covered Entities like Plaintiff are unable to fill every prescription for a 340B eligible claim at their own in-house pharmacies. For this reason, Plaintiff entered into "Pharmacy Services Agreements" ("Agreements") with specialty pharmacies also owned by CVS Health, called Caremark LLC d/b/a CVS Specialty, the "Contract Pharmacies."[3]

[3] In the 340B Program, a "Contract Pharmacy" is a retail or specialty pharmacy that enters into an agreement with a covered entity (like a hospital or clinic) to dispense medications at discounted 340B prices to the covered entity's patients.

For those 340B eligible patients that are required by network design or elect to have their drugs filled at CVS Specialty, Plaintiff contractually permitted Caremark LLC/CVS Specialty to retain a "dispensing fee." In order to fulfill the mission of the 340B program, Caremark LLC/CVS Specialty were contractually obligated to remit back to Plaintiff all payments received for the drug dispensed to a 340B eligible patient, less the dispensing fee.

5. Covered Entities rely on Contract Pharmacies and third-party administrators to manage dispensing the 340B drugs, billing the drug claims to PBMs for adjudication, collecting any applicable co-pay or co-insurance from the patients, and remitting the fully adjudicated/gross insurance payment amount less a dispensing fee back to the Covered Entities.

6. The Agreements between Plaintiff and Caremark LLC require Defendants to pass along to Plaintiff all revenues the PBM receives from insurance carriers and other third-party payors for the 340B-discounted drugs dispensed, minus a dispensing fee. The adjudicated payment amount from payors, less the dispensing fees, is the amount Defendants owe Plaintiff under the Agreements (the "340B Remittance").

7. Caremark LLC d/b/a CVS Specialty is well compensated for dispensing the 340B drugs that are prescribed by Plaintiff's 340B eligible prescribers, receiving a certain defined percentage of the adjudicated reimbursement for the 340B drugs as their dispensing fee. The dispensing fee is mostly profit for Caremark LLC d/b/a CVS Specialty, net of only limited administrative costs, since Contract Pharmacies do not pay the cost of the 340B drugs.

8. But Caremark LLC/CVS Specialty's substantial dispensing fee under the Agreements is not enough for Defendants. To divert and retain even more of the 340B Savings for themselves, CaremarkPCS, Caremark LLC, and other affiliates within the CVS Health umbrella conspired to secretly and drastically lower the 340B Remittance that would be passed on to

Plaintiff.

9. Defendants improperly diverted 340B Savings for themselves by implementing a secret pricing scheme for 340B drugs, which required cooperation among its affiliated entities within the 340B drug supply chain. Here, CVS Health vertically owns (1) CaremarkPCS, the PBM, that sets network reimbursement rates to pharmacies, (2) Caremark LLC d/b/a CVS Specialty, the Contract Pharmacies that dispense the 340B drugs at issue, and (3) Wellpartner, the 340B third party administrator ("TPA") that identifies which claims are 340B claims and provides the Plaintiff with data that intentionally hid the actual revenue and payments received by CaremarkPCS for the drugs. These affiliated entities worked together behind the prescription drug transaction to secretly manipulate the 340B reimbursement rate while concealing their scheme from Plaintiff.

10. The scheme operates as follows. Patients are assigned by their pharmacy benefit plans to a single network. Nearly 68,000 pharmacies participate in CVS's network.[4] Generally, each network has its own standard network reimbursement rates for all patients in the network. When Caremark LLC/CVS Specialty dispenses a drug to a 340B-eligible patient, it is adjudicated under CaremarkPCS' standard national network reimbursement rate at the point of sale. During the "adjudication process" at the "point of sale," CaremarkPCS informs Caremark LLC/CVS Specialty the reimbursement amount and directs Caremark LLC/CVS Specialty to collect a copayment from the patient. CaremarkPCS pays Caremark LLC/CVS Specialty, the Contract Pharmacy, under this standard reimbursement.

11. After the point of sale, CVS Health's 340B Third Party Administrator, WellPartner flags the adjudicated claim as a 340B claim and relays that information to CaremarkPCS and Caremark LLC/CVS Specialty. For any such 340B claims, CaremarkPCS and Caremark

[4] Caremark FAQs (last accessed May 15, 2026) at https://bmshc.org/wp-content/uploads/2025/07/CVS_Caremark_Member_FAQs.pdf.

LLC/CVS Specialty artificially lower the reimbursement rate. CaremarkPCS retains the "Spread" comprised of the difference between (1) the total revenue paid from all outside sources or third-party payors to CaremarkPCS or its affiliates for 340B drug claims, and (2) the artificially depressed reimbursement amount that CaremarkPCS pays to Caremark LLC/CVS Specialty (here, a Contract Pharmacy that has signed a Pharmacy Services Agreement with Plaintiff) for the same 340B drugs.

12. The 340B reimbursement amount is substantially lower than the original reimbursement amount that was paid at the point of sale, under the standard network reimbursement rates. Indeed, the patient already received the drug and paid a copayment based on the originally adjudicated claim at the higher standard network reimbursement rate.

13. This 340B arrangement operated by the Defendants existed, and likely continues to exist, solely to divert and retain a significant portion of the 340B Savings intended to flow to the Covered Entities. Upon information and belief, both payors and patients are paying for the drugs at the full standard reimbursement rate, and they are not refunded the difference, which is instead pocketed by Defendants.

14. The differential pricing scheme resulted and continues to result in Defendants retaining a portion of the 340B Savings on top of the dispensing fee and TPA fee permitted under the Agreements. Plaintiff is deprived of much of the 340B Savings that it would otherwise have received but for Defendants' unlawful scheme.

15. This not only constitutes a breach of contract by paying Plaintiff less than the 340B Remittance amount that Plaintiff was entitled to under the Agreements but also constitutes a deceptive and unfair practice under the Wisconsin Deceptive Trade Practices Act (Wisc. Stat. § 100.18), common law fraud and violations of the Racketeer Influenced and Corrupt Organizations

Act (RICO), 18 U.S.C. § 1962(c).

16. Plaintiff has conducted an internal investigation using a subset of claims and available remittance data.

17. Based on Plaintiff's preliminary review of this dataset, Plaintiff estimates that Defendants' breaches have led to ***more than $18 million dollars*** in damages and losses to Plaintiff since 2020.

18. The Agreements have an audit provision, yet Defendants, in violation of that audit provision and HRSA requirement, have refused Plaintiff's reasonable requests to access relevant data and conduct a transparent audit of CaremarkPCS, Caremark LLC and their affiliates to determine the full scope of Spread on the 340B claims.

19. The above scheme is consistent with publicly available information that CVS is profiting handsomely from the 340B Program.[5] CVS Health has warned investors in filings with the SEC that any reduction in 340B contract pharmacy arrangements could "materially and adversely affect the Company,"[6] and both public reporting and congressional investigations alike have revealed that CVS-affiliated retail and specialty contract pharmacies retain a substantial portion of 340B Savings in the hundreds of millions (if not billions) of dollars for CVS.[7]

20. Defendants' fraudulent, unlawful, and deceptive profiteering from 340B is contrary to the intent and purpose of the 340B program, which is to support a Covered Entity's ability to

---

[5] See, e.g., https://www.drugchannels.net/2025/05/follow-340b-dollar-senator-cassidy.html (last accessed Mar. 1, 2026).

[6] See CVS Health Corporation 2021 Form 10-K at 25 (pdf pag.), available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0000064803/d06cfa07-b8f8-49c0-9f5c-552a41b68e5d.pdf (last accessed Mar. 1, 2026).

[7] See, e.g., https://www.help.senate.gov/rep/newsroom/press/chair-cassidy-releases-report-on-340b-reform-calls-for-congressional-action (last accessed Mar. 1, 2026); see also https://www.help.senate.gov/imo/media/doc/final_340b_majority_staff_reportpdf1.pdf (last accessed Mar. 1, 2026).

"provide direct clinical care to large numbers of uninsured Americans." H.R. Rep. 102-384, pt. 2, at 12 (1992).

21. Defendants' fraudulent, unlawful, and deceptive practices have harmed Plaintiff by taking millions of dollars that were supposed to flow to Plaintiff and support the provision of charitable medical care to the uninsured and under-insured.

22. And, when Plaintiff sought to conduct an audit of Defendants' books and records as Plaintiff was obligated to do under HRSA requirements and permitted to do under the Agreement, Defendants refused to permit an audit. Thereafter, Plaintiff invoked the cooperation provision in the parties' Agreement to attempt to resolve the dispute in good faith. Rather than cooperate, Defendants ***terminated*** Plaintiff from the 340B contract pharmacy arrangement in apparent retaliation for uncovering the fraudulent scheme described herein and seeking to fulfill their obligations under the 340B Program and HRSA requirements.

23. Defendants' fraudulent, unlawful, and deceptive scheme was knowingly and intentionally carried out to secretly divert 340B Savings to further their own financial growth and profitability.

24. Accordingly, Plaintiff brings this action against Defendants seeking redress for the financial harm and lost 340B Savings caused to Plaintiff by Defendants' discriminatory pricing, breach of contract, deceptive and unlawful practice, and fraudulent conduct; Plaintiff seeks three times the 340B revenue and Spread that Defendants improperly retained and were unjustly enriched therefrom; Plaintiff also seeks attorneys' fees and costs; and seeks to enjoin the unlawful and retaliatory terminations of the Agreements, and to enjoin Defendants from their ongoing and continuing breaches, as well as any other relief the Court deems just and proper.

## THE PARTIES

### I. Plaintiff

25. Plaintiff Froedtert Memorial Lutheran Hospital, Inc. is a non-profit organization hospital with its principal place of business located at 900 N. 92nd St., Milwaukee, WI 53226.

26. Plaintiff is a Covered Entity under the 340B Program, as defined *supra*, ¶ 1, that has registered its principal place of business as well as its off-site outpatient facilities (referred to as "Child Sites") with HRSA.

27. Plaintiff entered into Pharmacy Services Agreements with Caremark, LLC and its affiliates for contract pharmacy services.

### II. Defendants

28. Defendant CVS Health Corporation ("CVS Health") is a Delaware corporation with a principal place of business at One CVS Drive, Woonsocket, RI 02895. At all times relevant to this Complaint, CVS Health exercised common ownership and control over the other Defendants, who are wholly owned subsidiaries of CVS Health. CVS Health transacts and conducts significant business in this judicial district, including through the operation of pharmacy benefit management (PBM) services, its pharmacies and provision of specialty pharmacy services to Plaintiff.

29. Defendant CaremarkPCS Health, LLC ("CaremarkPCS") is a Delaware limited liability company with a principal place of business at 9501 E. Shea Blvd., Scottsdale, AZ 85260. CaremarkPCS transacts and conducts significant business in this judicial district, including through the provision of PBM services to Plaintiff.

30. Defendant Caremark, LLC ("Caremark LLC") is a California limited liability company with a principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. Caremark LLC transacts and conducts significant business in this judicial district, including

through the provision of contract pharmacy services to Plaintiff.

31. Caremark LLC is the legal entity that does business as or under the trade name "CVS Specialty Pharmacy" or "CVS Specialty."

32. Defendant WellPartner, LLC ("WellPartner") is a Delaware corporation with a principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. WellPartner transacts and conducts significant business in this judicial district, including through the provision of third-party administration services to Plaintiff.

33. Defendants CaremarkPCS, Caremark, LLC d/b/a CVS Specialty, and WellPartner are wholly owned subsidiaries of Defendant CVS Health and, among other things, function as pharmacy benefits managers and pharmacies for prescription drugs administered by CaremarkPCS nationwide. The practices and conduct that is alleged in this Complaint are common and jointly attributable to all Defendants.

34. Defendants John Doe 1-5 are individual officers of CVS Health who executed and ratified the fraudulent arrangement between CaremarkPCS (the PBM), on the one hand, and Caremark, LLC d/b/a CVS Specialty (the Contract Pharmacies), on the other, knowing that the scheme would deprive Plaintiff and other Covered Entities of 340B Remittance they would otherwise have received.

35. Defendants John Doe 6-10 are individual officers of CaremarkPCS who executed and ratified the fraudulent arrangement between CaremarkPCS (the PBM), on the one hand, and Caremark, LLC d/b/a CVS Specialty (the Contract Pharmacies), on the other, knowing that the scheme would deprive Plaintiff and other Covered Entities of 340B Remittance they would otherwise have received.

36. Defendants John Doe 11-15 are individual officers of Caremark LLC and/or CVS

Specialty who executed and ratified the fraudulent arrangement between CaremarkPCS (the PBM), on the one hand, and Caremark, LLC d/b/a CVS Specialty (the Contract Pharmacies), on the other, knowing that the scheme would deprive Plaintiff and other Covered Entities of 340B Remittance they would otherwise have received.

37. The identities of the Doe defendants who knowingly executed and ratified the fraudulent scheme described herein are presently unknown to Plaintiff. All Doe defendants have served as officers, representatives, and/or agents of the corporate Defendants who employed them and were acting within the course, scope and authority of such employment for the conduct described below.

## JURISDICTION AND VENUE

38. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(a), because there is complete diversity between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.

39. This Court also has federal question jurisdiction over the Racketeer Influenced and Corrupt Organizations Act (RICO) claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964, because this action is brought by Plaintiff seeking to enjoin and to recover damages for losses caused by Defendants' violations of RICO.

40. Moreover, exercise of federal jurisdiction over this action is especially appropriate, as Plaintiff alleges that Defendants are profiteering from the federal 340B Program by diverting funds from the Covered Entities that Congress intended to be the beneficiaries of the 340B Program.

41. This Court has personal jurisdiction over Defendants, because among other things, Defendants are present in the State of Wisconsin and are authorized to conduct and regularly

conduct business in Wisconsin. Defendants have marketed, promoted, distributed, and sold their services in Wisconsin and Defendants have sufficient minimum contacts with this State and sufficiently availed themselves of the protections of the laws of this State through their promotion, sales, marketing, and servicing within Wisconsin to render the exercise of jurisdiction by this Court permissible.

42. Defendants further satisfy the requirements for the exercise of personal jurisdiction under the Wisconsin State long-arm statute, Wis. Stat. Ann. § 801.05.

43. Defendants have committed and conspired to commit tortious activity in the state of Wisconsin that has caused injury to a resident in the state.

44. Additionally, the Pharmacy Services Agreement calls for Wisconsin law to be applied.

45. This Court also has supplemental jurisdiction over the state law claims in this matter pursuant to 28 U.S.C. § 1367(a).

46. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of the action is situated in this district.

## FACTS AND INFORMATION COMMON TO ALL COUNTS

### I. The Federal 340B Program

47. In 1992, Congress enacted Section 340B as an amendment to the Public Health Service Act. Veteran's Health Care Act of 1992, Pub. L. No. 102-585 § 602, 106 Stat. 4943, 4967–71.

48. Congress designed 340B to assist certain healthcare facilities serving poor, uninsured or otherwise vulnerable populations. See Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602 (codified as amended at 42 U.S.C. § 256(b)).

49. Under 340B, drug manufacturers—as a requirement to participate in Medicaid—are required to charge hospitals and other 340B providers no more than a significantly discounted "ceiling price" on certain outpatient prescription drugs purchased by these entities for their patients. 42 U.S.C. § 256b(a)(1), (4).

50. In turn, 340B providers can "pass on" those savings to their patients through lower costs for medications, or, as contemplated by 340B itself, 340B providers can seek reimbursement for 340B drugs in the normal course and use those greater profit margins to subsidize other unfunded areas of their operations (note, most 340B providers are safety net providers, mandated by law or regulation to take on a disproportionate amount of uninsured or indigent patients).

51. Because certain 340B providers, such as small community health centers, may not have in-house pharmacies, the Health Resources and Services Administration (HRSA) – the agency charged with administering 340B – issued sub-regulatory guidance in 1996 permitting 340B providers to "contract" with outside pharmacies (i.e., Contract Pharmacies), and to allow 340B inventory to be dispensed through such Contract Pharmacies. See 61 Fed. Reg. at 43,549.

52. In 2010, however, HRSA dramatically shifted the 340B Contract Pharmacy landscape by permitting 340B providers to maintain an unlimited number of Contract Pharmacy relationships. See 75 Fed. Reg. 10,272-01 (Mar. 5, 2010). In the wake of this HRSA guidance, for-profit pharmacies, especially those owned or affiliated with PBMs, have seized on the opportunity to capitalize on substantial 340B drug discounts. Indeed, the 2010 guidance opened the door for the largest and most sophisticated for-profit PBMs to realize substantial profits by taking

advantage, and undercutting the purpose, of the federal drug pricing program designed to aid non-profit 340B providers caring for the most resource-strapped and vulnerable patients.

53. The 340B Program "was intended to enable certain hospitals and clinics 'to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services.'" H.R. Rep. 102-384, pt. 2, at 12 (1992). Put another way, a fundamental aim of 340B is to permit 340B providers to "provide direct clinical care to large numbers of uninsured Americans" regardless of their ability to pay. Id.

54. HRSA has advised that Covered Entities like Plaintiff may use the "savings" obtained by retaining the difference between the "actual acquisition cost" of the 340B-discounted drugs and the usual market reimbursement, "to reach more eligible patients and provide more comprehensive services." HRSA, *Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services*, 61 Fed. Reg. 43,551 (Aug. 23, 1996).

55. Congress did not intend 340B discounts to become a financial windfall for PBMs and their related pharmacies.

## II. Pharmacy Benefit Managers and the 340B Program

56. PBMs are fiscal intermediaries that administer and manage drug benefits on behalf of health insurance plans. PBMs are primarily responsible for processing and paying prescription drug claims submitted by providers on behalf of covered beneficiaries. The largest PBMs unilaterally dictate the provider's reimbursement for dispensing or administering the drug and the health plan will, in turn, reimburse the PBM for the amount paid to the provider.

57. The largest PBMs are owned or affiliated with the nation's largest health insurance companies. These PBMs also own or are affiliated with retail, mail-order and/or specialty pharmacies. As a result, a small number of huge, vertically integrated corporations wield near-

limitless power and influence in the prescription drug market and the adjudication of 340B eligible claims.

58. Today, three PBMs control nearly 80 percent of the prescription drug market: CaremarkPCS, Express Scripts, and OptumRx.[8] Each of these PBMs also share common ownership with a major insurer and specialty and/or mail-order pharmacy. CaremarkPCS is owned by CVS Health, which also owns health insurer Aetna and CVS retail, mail order, and specialty pharmacies.

59. Between 2010 and 2020, the number of contract pharmacy arrangements with 340B providers grew by 4,228%.[9] This expansion has coincided with an increasing reliance on PBMs. In 2024, hospitals had approximately 83,000 total relationships with contract pharmacies, and between 2020 and 2025, CaremarkPCS dramatically increased the number of its PBM-affiliated contract pharmacy relationships from approximately 23,000 to 77,000.[10]

60. CVS Health is the largest contract pharmacy participant in the 340B Program, with an estimated 77,000 contract pharmacy relationships, out of nearly 230,000 nationally.[11]

---

[8] Adam Fein ("Fein"), Drug Channels ("DC"), *The Top Pharmacy Benefit Managers of 2023: Market Share and Trends for the Biggest Companies—And What's Ahead,* (Apr. 9, 2024) https://www.drugchannels.net/2024/04/the-top-pharmacy-benefit-managers-of.html (last accessed Mar. 1, 2026).

[9] Aaron Vandervelde et al ("Vandervelde"), BRG, For-Profit Pharmacy Participation in 340B Program, at 4 (Oct. 2020), https://media.thinkbrg.com/wp-content/uploads/2020/10/06150726/BRG-ForProfitPharmacyParticipation340B_2020.pdf (last accessed June 30, 2026); see also AIR340B ("AIR340B"), *The Impact and Growth in 340B Contract Pharmacy Arrangements – Six Years Later*, at 1, https://340breport.com/wp-content/uploads/2024/05/AIR340B_340B-Contract-Pharmacies.pdf (last accessed June 30, 2026).

[10] Fein, DC, *The 340B Contract Pharmacy Market in 2025: Big Chains and PBMs Tighten Their Grip*, https://www.drugchannels.net/2025/06/340b-contract-pharmacy-market-in-2025.html (last accessed June 30, 2026).

[11] Id.

61. The above contract pharmacy relationships translate to substantial profits for CVS from 340B. In 2022 and 2023, CVS Health-affiliated contract pharmacies reported more than $800 million in gross profits.[12]

### III. CaremarkPCS's Operations Within the Broader PBM Landscape

62. The PBM industry has undergone significant consolidation in recent years. As noted above, approximately eighty percent (80%) of the PBM marketplace (or 80% of the covered lives in the United States) is comprised of three PBMs: CaremarkPCS, Express Scripts, and OptumRx. While there are other, smaller PBMs who administer some plans, the vast majority of lives are now managed by these three extremely large PBMs.

63. CaremarkPCS itself controls twenty-seven percent (27%) of the PBM market nationally.[13]

64. As a PBM, CaremarkPCS processes claims for prescription drug benefits for many plan sponsors who are contracted directly with it or with its affiliates. This includes commercial insurance plans, Medicaid plans, and various Medicare Advantage and Medicare Part D plans.

65. PBMs like CaremarkPCS also have a network of pharmacies that dispense drugs to its clients' members and CaremarkPCS unilaterally controls the reimbursement rates and dispensing fees that the network pharmacies receive for the dispensed drugs.

66. In particular, CaremarkPCS manages the pharmacy benefits of more than 80 million plan members and beneficiaries. In addition, because CaremarkPCS is wholly owned by

---

[12] https://nephronresearch.com/340b-pharmacy-tailwind-manufacturer-headwind-poised-to-reverse-in-2h-2023/ (last accessed Mar. 1, 2026). Upon information and belief, CVS' report of gross profits for its contract pharmacies does not include the profits from the 340B pricing scheme described herein because those profits are captured and reported by CaremarkPCS.

[13] See https://www.drugchannels.net/2025/03/the-top-pharmacy-benefit-managers-of.html (last accessed Mar. 1, 2026); see also https://www.statista.com/statistics/1387515/market-share-of-largest-pbm-in-every-us-state/ (last accessed Mar. 1, 2026).

CVS Health, it is affiliated with CVS Health's "mail service pharmacy," an expanding specialty pharmacy, CVS Specialty, 9,900 brick and mortar CVS Pharmacies, out of the 77,000 in-network pharmacies in Caremark's "network."

67. PBMs like CaremarkPCS serve as intermediaries between pharmaceutical manufacturers and physician dispensers/pharmacies on one hand, and health benefit plans on the other. By managing both ends of the transaction (i.e., the reimbursement rate PBMs pay to pharmacies and the amounts the PBMs charge health benefit plan for such drugs), PBMs like CaremarkPCS are able to secretly retain Spread and other hidden cash flow to bolster its own profit at the expense of health benefit plans and even Covered Entities.

68. As relevant here, many of CVS Health's retail, mail-order and specialty pharmacies also serve as "Contract Pharmacies" for Covered Entities under the 340B Program. These Contract Pharmacy services are provided under different subsidiary entities, including Defendant Caremark LLC d/b/a CVS Specialty.

69. CaremarkPCS's and CVS Health's control over all aspects of the marketplace and drug supply chain (e.g., the relationships between drug manufacturers and health plans, between health plans and network pharmacies, between network pharmacies acting as Contract Pharmacies and Covered Entities, and between CaremarkPCS and 340B TPA WellPartner), allows Defendants to engage in fraudulent schemes, including the 340B discriminatory pricing scheme alleged herein.

## IV. Relationship Between Defendants, Group Health Plans and Insurance Carriers, and Pharmacies

70. Group health plans, including self-funded employer plans, contract with CaremarkPCS for provision of administrative services related to adjudication and payment of network claims.

71. CaremarkPCS' pharmacy network includes mail-order, specialty, and retail pharmacies owned and operated by subsidiaries under the CVS Health umbrella, including pharmacies operated by Defendant Caremark LLC d/b/a CVS Specialty.

72. CaremarkPCS requires network pharmacies to comply with its policies, procedures, and other terms and conditions for network participation, including the reimbursement rates (including the ingredient cost and dispensing fees) that the pharmacies will receive from CaremarkPCS for the drugs dispensed to members of CaremarkPCS' clients.

73. Once CaremarkPCS receives a claim from a network pharmacy at the "point of sale" and the PBM determines that billed services are covered by one of its clients' plans, it determines at the point of sale, through an online adjudication process, the eligibility of the claim under a particular network, the reimbursement amount the network pharmacy is entitled to as per the rates dictated by CaremarkPCS (the "point-of-sale reimbursement rate"), and the appropriate co-pay or co-insurance amount that must be paid by the patient.

**V. The Role of 340B Third Party Administrator WellPartner**

74. The process of determining whether a particular claim is 340B eligible is complex, and responsibility for compliance lies with the Covered Entity. Among other duties, Covered Entities must ensure that prescriptions are 340B eligible, PBM payments to the Contract Pharmacies are tracked, and that the covered entity's 340B inventories are properly replenished.

75. To meet these responsibilities, Covered Entities typically hire a 340B Third Party Administrator ("340B TPA") that provide claims processing and management services and retroactively confirm with the Covered Entity which claims are 340B-eligible. TPAs, in turn, also receive a fee for their administrative services pursuant to contracts with the Covered Entities.

76. In fact, Contract Pharmacies owned or affiliated with CVS Health **mandate** the use of CVS's wholly owned subsidiary, WellPartner, as the 340B TPA by the Covered Entities.[14] The contract between Covered Entity Plaintiff and WellPartner for TPA services is a mandatory addendum to the Pharmacy Services Agreements. This mandate is set so that Defendants can secretly hide their fraudulent activity behind inaccurate and misleading data so that they divert the 340B Savings.

77. Contract Pharmacies do not determine prior to or at the point of sale whether the patient is eligible for 340B-discounted drugs. Instead, 340B determination occurs on the back-end, after the drugs have already been dispensed by the pharmacy, or in this case the Contract Pharmacy, to the 340B eligible patient.

78. When dispensing the 340B drugs, the Contract Pharmacy will also collect the applicable co-pay/co-insurance from the patient at the point of sale, even on 340B-discounted drugs. In the point-of-sale adjudication process, the PBM reports to the Contract Pharmacy the co-insurance the pharmacy must collect from the patient.

79. The co-pay or co-insurance amount collected from the patient is based on the originally adjudicated point-of-sale reimbursement rate that the PBM determines should be paid to the pharmacy for the cost of the drugs. This is again because, at the point of sale, the Contract Pharmacy is unaware that the drugs being dispensed are 340B-discounted drugs.

---

[14] Defendants have been sued across the country by Covered Entities and by the State of New York for mandating the use of WellPartner as an unlawful tying arrangement. See, e.g., *Brandywine Hospital, LLC v. CVS Health Corporation, et al.*, E.D. Pa. No. 2:23-cv-1458; *Sentry Data Systems Inc. v. CVS Health, et al.*, S.D. Fla. No. 0:18-cv-60257; see also https://ag.ny.gov/press-release/2022/attorney-general-james-sues-cvs-harming-new-york-safety-net-hospitals-and-clinics.

80. The complex relationship between the CaremarkPCS (the PBM), Caremark/CVS Specialty (the Contract Pharmacies), WellPartner (the 340B TPA), and Plaintiff (the Covered Entity) is summarized in the figure below, relating to a Medicare claim:




81. From left to right in the figure, an insurance plan (Plan) pays CaremarkPCS (the PBM) for the drug dispensed to a patient. CaremarkPCS then pays CVS Specialty (the Contract Pharmacy) for dispensing the drug. CVS Specialty keeps a dispensing fee and remits the remainder to the Covered Entity Plaintiff (the "340B Remittance"). Finally, Wellpartner (the TPA) collects an administrative fee from Plaintiff. Plaintiff (the Covered Entity) receives the remaining money (the "340B Savings").

82. CaremarkPCS and CVS Health exploit their vertical control over the entirety of the 340B Drug Supply Chain, through the PBM, the mandatory use of Wellpartner and CVS Specialty. Through that process, Defendants have created a discriminatory pricing scheme wherein

CaremarkPCS receives payment for a drug claim from the payor/plan; adjudicates the drug claim at the point of sale at the standard national network reimbursement rates, and determines the appropriate pharmacy reimbursement and co-pay/co-insurance amounts; CVS Specialty actually collects the adjudicated reimbursement and co-pay/co-insurance.

83. However, after WellPartner informs CaremarkPCS and CVS Specialty that the claim is a 340B drug claim, CaremarkPCS and CVS Specialty reprocess the already successfully-adjudicated claim in a secret 340B-only network. In this 340B-only network, CaremarkPCS artificially reduces the reimbursement on that claim, despite the fact that patient has already paid the relevant co-pay or co-insurance on the higher price, and retain the difference between the original point-of-sale reimbursement and the artificially reduced rate. Defendants do not inform Covered Entities of the original, higher reimbursement for the drug.

84. Defendants have no legitimate purpose for this transaction other than to divert a higher than contractually required portion of the 340B Savings to themselves as pure profit.

85. As a consequence of Defendants' actions, the 340B Savings are not passed on to the Covered Entity Plaintiff to be used for 340B program intended purposes such as indigent care programs.

## VI. The Parties' Pharmacy Service Agreements

86. The Agreements between Plaintiff and Caremark LLC provide for the provision of Contract Pharmacy services by Caremark LLC (as the "Specialty Pharmacy").

87. The Agreements impose obligations not merely on Caremark but also its affiliates. Indeed, in the introductory paragraph to the Agreements, the parties are defined as the "Covered Entity," on the one hand, and Caremark LLC and its affiliates (collectively defined as the "Pharmacy") on the other hand.

88. As relevant here, the Agreements contain substantially similar provisions that provide that the "Pharmacy" (again, defined as Caremark LLC and its affiliates) owes the Covered Entity Plaintiff an amount equal to the reimbursement for the drug less the dispensing fee.

89. In other words, under the Agreements, ***all reimbursement*** received by Caremark LLC or any of its affiliates from third party payors must be remitted to the Covered Entity Plaintiff less the applicable dispensing fee. And, because Defendants CVS Health and CaremarkPCS, among others, are also affiliates of Caremark, any payments the PBM receives from payors must also be passed on to the Covered Entity Plaintiff.

90. As further alleged below, Defendants failed to comply with this pass-through provision of the Agreements.

## VII. The Audit Provisions in the Pharmacy Service Agreements

91. In part because of the opaqueness of how 340B claims are identified after the point of sale, HRSA asks Covered Entities to audit their Contract Pharmacies to ensure that 340B drugs are not being diverted (i.e., going to non-eligible patients) and that Covered Entities' participation in the 340B program complies with all 340B rules and regulations.[15]

92. The Pharmacy Services Agreements contain procedures for Plaintiff to conduct audits of Caremark LLC.

93. Under the audit provision, Plaintiff has the right to audit the Contract Pharmacy's books and records to ensure compliance with the terms of the Agreements.

94. Caremark LLC, in its capacity as the Contract Pharmacy, agreed to cooperate with any such audits in good faith.

---

[15] HRSA audit and compliance parameters under the contract pharmacy guidelines (last accessed May 15, 2026) at https://www.hrsa.gov/about/faqs/what-are-audit-compliance-parameters-under-contract-pharmacy-guidelines.

95. As further alleged below, Caremark LLC failed to meet its obligation to comply with Plaintiff's reasonable audit requests.

96. CaremarkPCS and Caremark LLC's motivation to refuse to permit the audit was to hide the fact that Defendants diverted the 340B Savings to themselves in violation of Program terms and Agreements' terms.

## VIII. HRSA Guidelines and Regulations Governing Contract Pharmacy Services Agreements

97. The Parties also agreed to comply with the contract pharmacy services guidelines as promulgated by HRSA's Office of Pharmacy Affairs ("OPA").

98. HRSA has stated that the primary intent of the 340B Program is to "enable[] covered entities to stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services."[16]

99. HRSA has also issued guidance that Covered Entities may bill insurers for the 340B drugs at higher than the actual acquisition cost, and use the revenue from the usual market reimbursement to "reach more eligible patients and provide more comprehensive services" 61 Fed. Reg. 43549, 43551 (Aug. 23, 1996 Final Notice).

100. In 2010, HRSA reaffirmed that "***the benefit of the program was intended to accrue to the covered entities***" – not to the PBMs. 75 Fed. Reg. 10272, 10277 (Mar. 5, 2010 Final Notice) (emphasis added).

101. As further alleged below, Caremark LLC failed to meet its obligation to comply with these HRSA/OPA guidelines and regulations.

---

[16] https://www.hrsa.gov/opa (last accessed Mar. 1, 2026).

### IX. Defendants' Fraudulent and Discriminatory Pricing Scheme on 340B Claims and Retention of the Spread Between the Amount Paid by the Payor/Plan and the Monies Received by the Covered Entity

102. Through their discriminatory pricing scheme, Caremark LLC d/b/a CVS Specialty, in conjunction and coordination with CVS Health, CaremarkPCS, and WellPartner, conspired together to breach the above-referenced HRSA regulations and guidelines, and to hide those breaches. The individual Doe defendants are unidentified employees and officers of CVS Health Corporation, CaremarkPCS Health, and Caremark LLC who knowingly ratified and executed the illegal and fraudulent scheme described herein and set the scheme in motion.

103. Caremark LLC d/b/a CVS Specialty serves as Contract Pharmacies for Plaintiff (Covered Entity) pursuant to the Agreements. The Contract Pharmacy services are provided by specialty pharmacies that are already part of CaremarkPCS' standard pharmacy networks. Each standard pharmacy network has "covered lives" in it, and pre-determined standard reimbursement rates.

104. When a 340B eligible patient of Plaintiff seeks to fill a prescription for 340B drugs at Caremark LLC or CVS Specialty, the claim is (1) adjudicated by CaremarkPCS/the PBM at the point of sale based on the standard network reimbursement rates; (2) the drugs are dispensed to the patient; (3) CaremarkPCS/the PBM reimburses CVS Specialty/the Contract Pharmacy according to the reimbursement rate under the applicable standard national network reimbursement rates; and (4) the patient pays the applicable co-pay or co-insurance based on the standard national network reimbursement.

105. Subsequently, CVS' wholly-owned 340B TPA WellPartner determines that the patient is 340B eligible and that the specialty drugs that were dispensed were in fact the 340B eligible drugs connected to the Covered Entity Plaintiff.

106. Once the 340B determination is made, Caremark LLC/CVS Specialty is obligated to pass on all insurance payments for the 340B drugs to Plaintiff, less an agreed-upon dispensing fee.

107. But this is not what occurred. For patients that receive specialty drugs from CVS Specialty where the PBM is CaremarkPCS, Plaintiff received a drastically reduced reimbursement rate for the 340B drugs.

108. The reason is Defendants' discriminatory pricing scheme for 340B drugs. CaremarkPCS and CVS Specialty conspire to artificially reduce the reimbursement rate to divert 340B Savings from the Covered Entity. CaremarkPCS retained the difference between the original point of sale payment for the drug and the lower reimbursement amount.

109. Plaintiff has access to reports from WellPartner, the 340B TPA, that show the "Insurance Paid Amount" reflecting the payor reimbursement reported by the CVS Specialty and remitted to Plaintiff. This "Insurance Paid Amount" WellPartner reports is substantially lower than the amount that CaremarkPCS actually received for the 340B drugs.

110. The WellPartner reports also contain a column/field for the applicable co-pay/co-insurance collected from patients on each 340B drug claim, but this column/field falsely reflects a "patient paid" amount of $0 for the majority of claims.

111. WellPartner therefore aided in making sure the fraud is hidden by falsely reporting the revenue received by CaremarkPCS.

112. Between 2020 and 2025, Plaintiff estimates that the "delta" between deflated reimbursement rate paid to the CVS/Caremark Contract Pharmacy and remitted to the Covered Entity, and the usual market reimbursement rate, exceeds ***$18 million***, as shown below:

| Year | Estimated Loss |
|---|---|
| 2020 | $3,233,730.35 |
| 2021 | $6,693,270.62 |
| 2022 | $4,283,863.89 |
| 2023 | $2,885,767.90 |
| 2024 | $498,602.97 |
| 2025 | $412,815.60 |
| | Total: **$18,008,051.32** |

113. The explanation is CaremarkPCS's and CVS Specialty's discriminatory pricing scheme wherein Defendants and their affiliates arbitrarily slash the reimbursement on the 340B claims so that they can manufacture Spread.

114. Because the claim was already adjudicated at the point of sale by CaremarkPCS, the only way the "switch" occurs is if CaremarkPCS and CVS Specialty covertly worked together to deprive the 340B Covered Entity of funding intended for charitable and indigent care. Defendants did this solely to reduce the 340B Remittance that was owed to the Covered Entity Plaintiff under the Agreement, and to divert more of the 340B revenue to themselves.

115. The switch to the lower-reimbursement occurs entirely on the back-end by and between CaremarkPCS (the PBM) and Caremark LLC/CVS Specialty (the Specialty Pharmacy), out of sight of the payors, Covered Entity, or even the patients, who ended up paying (and are likely continuing to pay) more out-of-pocket based on the higher, originally adjudicated price.

116. To summarize, under CVS's discriminatory 340B pricing scheme, CaremarkPCS received the originally adjudicated Reimbursement amount (reflecting the standard national network reimbursement rate CaremarkPCS paid at the point of sale before the pharmacy knows whether the drugs being dispensed are 340B-discounted drugs). After learning that the claim was a 340B claim, CaremarkPCS and Caremark LLC/CVS Specialty conspire to lower the point-of-sale Reimbursement amount. CaremarkPCS lowered the reimbursement rate for the 340B drug

paid to its affiliated pharmacy for the purpose of creating an artificial Spread and kept the difference.

117. To illustrate how the scheme works, suppose a hypothetical drug with an Average Wholesale Price ("AWP") of $10,000 is typically reimbursed by CaremarkPCS to CVS Specialty at AWP-10%. The PBM thus should have paid CVS Specialty $9,000, and under the Agreements, Plaintiff should have received $9,000 minus a reasonable dispensing fee and a TPA fee charged by WellPartner.

118. Under Defendants' Scheme, however, once the claim is identified as 340B, the $9,000 transaction is reversed and altered to reflect the substantially reduced reimbursement rate. The "standard network rate" of approximately AWP-10% is changed to AWP-35%, as a hypothetical example, yielding a reimbursement rate of $6,500 (instead of $9,000). CaremarkPCS pays CVS Specialty the $6,500 for the 340B drug, and CaremarkPCS retains the additional $2,500 simply because CaremarkPCS knows it is a 340B claim where there is a large delta between the cost of the drug and the reimbursement.




119. To further illustrate how the scheme works, take the following real-world examples of 340B claims processed by CaremarkPCS:

| Drug (NDC) | Dispensed Date | CVS Specialty Pharmacy Reimbursement | Froedtert Specialty Pharmacy Reimbursement | Delta |
|---|---|---|---|---|
| Epclusa (61958220101) | May 2025 | $17,347.31 | $24,521.33 | $7,174.02 |
| Lorbrena (69022701) | May 2025 | $14,011.85 | $21,786.77 | $7,774.92 |

120. Both sets of claims in the table above are for the exact same 340B drugs (including quantity dispensed), dispensed in the same month, and covered by the same insurance plan

(managed by CaremarkPCS).[17]

121. In the first example, when the Epclusa prescription was filled at a Froedtert Specialty Pharmacy, the Covered Entity received from CaremarkPCS a payor reimbursement amount of $24,521.33, representing the gross insurance payment amount for the drugs.

122. However, when an identical Epclusa prescription was filled by CVS Specialty in the same month, the Covered Entity received from CaremarkPCS a payor reimbursement amount of just $17,347.31.

123. The $7,174.02 reflects the "Spread" artificially created and pocketed by the Defendants as pure profit.

124. In the second example, when the Lorbrena prescription was filled at a Froedtert Specialty Pharmacy, the Covered Entity received from CaremarkPCS a payor reimbursement amount of $21,786.77, representing the gross insurance payment amount for the drugs.

125. However, when an identical Lorbrena prescription was filled by CVS Specialty in the same month, the Covered Entity received from CaremarkPCS a payor reimbursement amount of just $14,011.85.

126. The $7,774.92 reflects the "Spread" artificially created and pocketed by the Defendants as pure profit.

127. The significant gaps between the remitted payor reimbursement amounts ($7,174.02 and $7,774.92 respectively) do not take into account the dispensing fee paid to Caremark/CVS Specialty under the Agreements or the TPA fee paid to WellPartner. Instead, the payor reimbursement reflects the reimbursement reported as received by the CVS Specialty/Contract Pharmacy from insurance plans/payors.

---

[17] For purposes of maintaining confidentiality, the identity of the patient, the drug dispensed, and payor information are not specified herein.

128. This gap cannot be explained by variances in reimbursement rates paid by different payors or plans, since both claims were paid by the same insurance plan.

129. Moreover, Plaintiff knows that the higher payor reimbursement amounts ($24,521.33 and $21,786.77, respectively) remitted to the Covered Entity on the claim dispensed at the Froedtert Specialty Pharmacy are representative of the fair market reimbursement rate for the drugs because they have other relationships where they receive reimbursements in line with the market reimbursement rates.

130. Froedtert also has a self-funded employee benefit plan such that Plaintiff has direct visibility into the ingredient cost and dispensing fee that the plan paid for specialty drugs, reflecting the fair market reimbursement rate.

131. Thus, the lower reimbursement amounts ($17,347.31 and $14,011.85, respectively) are far below the fair market reimbursement rate for the drugs in the examples and reflect the reduced reimbursement rate under the secret 340B discriminatory pricing scheme between CaremarkPCS and CaremarkLLC/CVS Specialty.

132. Indeed, an independent pharmacy and data analytics expert has reviewed the data and reimbursement rates reportedly received by CVS Specialty in the WellPartner remittance reports and concluded that they are far below CaremarkPCS's national network reimbursement rates.

133. Defendants' artificially deflated reimbursement scheme for 340B specialty drug claims is further demonstrated through the average monthly unit cost data that Aetna and Silverscript Medicare Part D Plans (both administered by CaremarkPCS) reported to CMS. Each year, Part D Plan Sponsors are required to submit drug unit cost data to CMS, which is then

published by CMS in the CMS Prescription Drug Plan Public Use File ("PPUF") dataset.[18]

134. For example, Silverscript reported for the drug Xtandi (NDC 469012599) an "average monthly unit cost" of $121.87 for Quarter 3 2022. In comparison, on August 8, 2022, CVS Specialty, through WellPartner, reported that it received $5,069.99 for 60 units of Xtandi, or $84.49 per unit, in reimbursement from a Silverscript Part D Plan.

| Drug (NDC) | Dispensed Date | CVS Specialty Pharmacy Reimbursement | CVS Specialty Pharmacy Reimbursement Per Unit | Silverscript PDP Reported Average Unit Cost in Q3 2022 |
|---|---|---|---|---|
| Xtandi (469012599) | 8/8/2022 | $5,069.99 | $84.49 | $121.87 |

135. Defendants lowered the 340B reimbursement by approximately $36 per pill for this particular drug simply to create a spread so that Defendants can pocket 340B Savings intended for Plaintiff to use for uninsured and indigent care programs.

136. The various examples and comparators set forth herein conclusively demonstrate that CaremarkPCS is paying CVS Specialty a reduced reimbursement for 340B-eligible specialty drugs that is drastically lower than the point-of-sale reimbursement paid to CaremarkPCS under its standard national pharmacy network.

137. But this reduced reimbursement rate is not disclosed to anyone outside of CVS Health umbrella. In particular, the lower rate was not passed onto the plans and payors who foot the bill for the drug claim. Instead, the plans and payors paid the higher point-of-sale adjudication price for the 340B drugs that reflects the usual market reimbursement rate.

[18] Available at https://data.cms.gov/provider-summary-by-type-of-service/medicare-part-d-prescribers/quarterly-prescription-drug-plan-formulary-pharmacy-network-and-pricing-information.

138. The patients are also paying a copay and co-insurance for the drugs based on the originally adjudicated amount.

139. The payors and patients who foot the bill for the drugs see no benefit of the lower "secret 340B" price; instead, the Defendants conceal the true price so they can retain all the "Spread" for themselves.

140. And, despite the payors and patients paying the originally adjudicated market reimbursement rate, this amount does not flow to the Covered Entity Plaintiff. Instead, Defendants divert a percentage of the 340B revenues to themselves.

141. Notably, ***no other parties outside of the CVS umbrella*** – not the payors, not the Covered Entity, and not the patients – knew about, consented to, or benefited from, the reduced secret 340B rate.

142. Indeed, even the Contract Pharmacies (Caremark LLC d/b/a CVS Specialty) would not have agreed to the lower 340B rate because it also reduces the dispensing fee that the Contract Pharmacies would be entitled to receive. This demonstrates that there is no true arms' length relationship between CaremarkPCS and Caremark LLC/CVS Specialty.

143. But the small difference in lost dispensing fee pales in comparison to the large Spread that CVS Health/CaremarkPCS receives, retains and profits from the 340B scheme. In other words, the scheme results in a huge net positive for the Defendants.

144. In fact, through the scheme, **CVS retains more than half of the 340B Savings** (defined as total third-party payor revenue on 340B drugs minus the 340B drug cost).

145. Between 2020 and 2025, Plaintiff estimates that **CVS/Caremark pocketed approximately 62.2% in 340B savings** (comprised of the dispensing fee, TPA fee, and 340B

spread retained through CVS's artificially deflated reimbursement scheme), **<u>whereas the Covered Entity only received 37.8%</u>**:




146. It is contrary to the fundamental design of the 340B Program that CVS/Caremark receive more than half of the 340B Savings because the 340B Savings is intended to flow to the Covered Entity to fund uninsured and indigent clinical care.

147. Moreover, the patients are also victimized by Defendants' scheme, since they pay a co-pay or co-insurance based on the higher, non-340B reimbursement rate initially adjudicated by the PBM at the point of sale. Upon information and belief, any excess co-pay or co-insurance paid by the patient as a result of the switch to the secret 340B price is not refunded.

148. WellPartner, CaremarkPCS, and Caremark LLC/CVS Specialty must conceal the full co-pay and co-insurance amounts from the Covered Entity Plaintiff, or otherwise it would reveal that the patients are paying co-pay and co-insurance at the point of sale based on a higher reimbursement rate.

149. In short, this scheme could not function without vertical integration. It requires a PBM willing to artificially slash reimbursement rates after the point of sale, a contract pharmacy

willing to accept that reduced rate, and a captive TPA willing to mask the true transaction from the Covered Entity.

150. The Defendants' scheme is a breach of the Agreements, and violates HRSA and OPA regulations and guidelines regarding contract pharmacy services.

151. Defendants agreed that Plaintiff would receive the full payment amount from all payors based on all reimbursement received for the 340B drugs, less the agreed-upon dispensing fee and TPA fee. However, due to Defendants' secret 340B arrangement, Plaintiff received far lower than the reimbursement received at the point of sale because Defendants contrived a scheme where CaremarkPCS retains a portion of the drug reimbursement and then pays Caremark LLC/CVS Specialty lower rates for the 340B claims, despite the fact that CaremarkPCS charged the plan/payor the original higher amount, and the 340B eligible patient the original higher copay just so that Defendants retain 340B profits.

152. Defendants falsely represented to Plaintiff that the 340B Remittance received by the Covered Entity was equal to the total reimbursement that the contract pharmacies (Caremark LLC/CVS Specialty) and their affiliates received for the 340B drugs (less the agreed-upon fees), but had actual knowledge that this was not the case.

153. Defendants knowingly and willingly engaged in this fraudulent, unlawful, and deceptive scheme regarding 340B drug claims despite the fact that it violates HRSA and OPA regulations and guidelines.

154. Defendants' scheme also constitutes wire fraud, and each Defendant played a distinct role in the execution of the scheme: (a) CaremarkPCS (in Arizona) transmitted electronic claims adjudication data and post-sale rate-reduction instructions via interstate computer networks directing CVS Specialty/Caremark LLC to accept, and CaremarkPCS to retain, an artificially

depressed “340B rate” for each identified 340B claim; (b) Caremark LLC d/b/a CVS Specialty (in Rhode Island) knowingly accepted the artificially reduced 340B rates directed by CaremarkPCS, transmitted and caused to be transmitted electronic reimbursement data reflecting those false amounts, and provided those false amounts to WellPartner for transmission to Plaintiff, despite being contractually obligated under the Agreements to pass the full reimbursement; (c) WellPartner, LLC (in Rhode Island) generated and transmitted to Plaintiff—by means of interstate electronic wire communications—remittance reports that falsely stated the reimbursements received and falsely reported patient co-pay/co-insurance amounts of $0.00; and (d) CVS Health Corporation, as the parent and controlling entity, directed and ratified the above conduct with full knowledge that the electronic remittance data transmitted to Plaintiff was materially false and that Plaintiff was deprived of 340B revenues to which it was entitled.

## X. The March 2, 2026 Audit Demand and Retaliatory Termination of the Agreements

155. On March 2, 2026, Plaintiff, through counsel, served a demand letter to the Executive Director of 340B at CVS Health and Caremark LLC (the “Demand Letter”) requesting access to relevant data to conduct an audit.

156. In that Letter, Plaintiff demanded that Caremark LLC and CaremarkPCS provide access to their books and records, including all electronic records, to verify and ensure compliance with the duties, obligations, and transactions outlined in the Agreements.

157. Plaintiff requested, among other things, (1) data showing any adjudication of the Covered Entity’s claims prior to the time the Pharmacy knew the patient was 340B eligible; (2) all communications between Caremark LLC/CVS Specialty and Wellpartner, (3) reconciliation reports for 340B drugs; (4) bi-monthly invoices identifying all claims that the Pharmacy will

provide reimbursement to Plaintiff; and (5) the reimbursement addenda in the contracts between Caremark LLC/CVS Specialty and various PBMs and plan sponsors.

158. As of the date of filing, however, Defendants have not meaningfully responded to Plaintiff's requests for data and information.

159. Instead, on April 22, 2026, in an effort to preclude the Covered Entity Plaintiff from exercising its right to conduct an audit as it is obligated to do under HRSA regulations, Defendants gave notice of termination of the Agreements in retaliation for uncovering the scheme and seeking to conduct an audit to uncover the exact measure of loss to the Plaintiff.

* * *

160. By retaining Spread and taking money intended to flow to Plaintiff for use in indigent care in accordance with the 340B Program, and refusing to provide the necessary data to evaluate the extent of Defendants' behavior and losses to Plaintiff, Defendants have breached the Agreements and Wisconsin law.

161. Furthermore, by conspiring to unlawfully deprive Plaintiff of its 340B savings, Defendants conducted an enterprise to carry out its scheme to commit a pattern of unlawful racketeering activity in violation of RICO, thereby causing significant financial injury to Plaintiff.

## CAUSES OF ACTION

### COUNT ONE
### BREACH OF CONTRACT

162. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

163. Plaintiff entered into Pharmacy Services Agreements with Caremark LLC d/b/a CVS Specialty and its affiliates. The Agreements constitute valid contracts between Plaintiff and Caremark LLC d/b/a CVS Specialty, which govern the relationship between the Parties.

164. The Agreements contain a provision relating to the remittance of all reimbursement obtained by Defendants from all sources (including patients and third-party payors), less an agreed-upon dispensing fee, to Plaintiff.

165. This provision applies not just to Caremark, but also to its subsidiaries and affiliates, including Defendants CVS Health, WellPartner, and CaremarkPCS.

166. The Agreements contain a provision under which the Contract Pharmacies agreed to abide by and comply with HRSA and OPA regulations and guidelines governing contract pharmacy services.

167. The Agreements also contain an audit provision under which Plaintiff has the right to audit the Contract Pharmacy's books and records to ensure compliance with the terms of the Agreements.

168. The Agreements further contain a compliance with law provision where Defendants agreed to comply with federal and state laws, rules and regulations, including the 340B statute and HRSA regulations governing 340B contract pharmacy services.

169. Plaintiff adequately performed all its obligations under the Agreements.

170. However, Defendants failed to perform under the Agreements, by (1) not remitting all payments made to CaremarkPCS at the point-of-sale for the 340B drugs to Plaintiff; (2) lowering the 340B reimbursement amount paid to Caremark LLC/CVS Specialty for no purpose other than to deprive Plaintiff of the 340B Savings; (3) not complying with HRSA and OPA regulations and guidelines referenced above that require Caremark LLC/CVS Specialty to ensure that all 340B savings will accrue to the Covered Entity and that Defendants will not retain Spread on 340B claims; and (4) not complying with Plaintiff's reasonable audit requests.

171. Plaintiff estimates ***more than $18 million in losses of 340B revenue*** due to Defendants' 340B scam to Plaintiff over the last six years.

172. As a direct and proximate result of Defendants' breach of contract, Plaintiff (and its patients and beneficiaries) has suffered concrete and irreparable harm as well as significant damages in an amount to be determined at trial.

**COUNT TWO**
**WISCONSIN DECEPTIVE TRADE PRACTICES ACT**
**Wis. Stat. § 100.18**

173. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

174. The Wisconsin Deceptive Trade Practices Act proscribes "false representations" defined as including, *inter alia*, representations made to the public in connection with the sale of goods or services that are "untrue, deceptive, or misleading." Wis. Stat. § 100.18(1).

175. The Wisconsin Deceptive Trade Practices Act creates a cause of action for anyone who suffers a "pecuniary loss because of a violation of this section." *See id*. § 100.18(11)(b)(2). The law also provides for actual damages, attorneys' fees and costs. *Id*.

176. Defendants engage in deceptive trade practices in violation of the Wisconsin Deceptive Trade Practices Act when they unlawfully divert 340B savings from Plaintiff through their discriminatory pricing scheme for 340B drugs, as alleged herein.

177. Defendants CVS Health, CaremarkPCS, and Caremark LLC d/b/a CVS Specialty conspired together and coordinated a scheme under which 340B drug claims were processed under a secret 340B discriminatory pricing scheme with significantly reduced reimbursement rates, with the goal of reducing the amount of 340B savings received by Plaintiff while Defendants lined their own pockets with funds that Congress intended to flow to the Covered Entity and its patients.

178. The John Doe Defendants executed and ratified the fraudulent arrangement between CaremarkPCS (the PBM), on the one hand, and Caremark, LLC d/b/a CVS Specialty (the Contract Pharmacies), on the other, knowing that the scheme would deprive Plaintiff and other Covered Entities of 340B revenue they would otherwise have received.

179. Defendants committed a deceptive trade practice as defined in Wis. Stat. § 100.18 by (1) misrepresenting that Caremark LLC/CVS Specialty would remit all reimbursement obtained by Defendants from all sources (including patients and third-party payors) for the 340B drugs by to Plaintiff; (2) misrepresenting (and indeed, concealing) the existence of a discriminatory under-reimbursement scheme that lowered the 340B reimbursement amount paid to Caremark LLC/CVS Specialty for no purpose other than to deprive Plaintiff of the 340B Savings; and (3) misrepresenting that Defendants would comply with HRSA and OPA regulations and guidelines to ensure that all 340B savings will accrue to the Covered Entity and that Defendants will not retain Spread on 340B claims.

180. Defendants acted willingly and knowingly to retain the profits that were intended to flow to the Covered Entity.

181. Defendants failed to provide Plaintiff the promised benefits and captured the 340B savings for themselves when Defendants represented that the 340B savings would flow to the Plaintiff minus a dispensing fee.

182. Plaintiff would not have entered into the Agreements had they known that Defendants would impose discriminatory pricing that dramatically reduced the reimbursement paid to Contract Pharmacies from the originally adjudicated market rate at the point-of-sale, in exchange for a lower reimbursement, to the tune of **$18 million** between 2020 and 2025.

183. As a direct and proximate result of Defendants' deceptive trade practices in violation of the Wisconsin Deceptive Trade Practices Act, Plaintiff and its beneficiaries have suffered concrete and irreparable harm as well as significant damages in an amount to be determined at trial.

184. Plaintiff further seeks attorneys' fees and costs incurred in connection with this action under Wis. Stat. § 100.18(11)(b)(2).

**COUNT THREE**
**COMMON LAW FRAUD / INTENTIONAL MISREPRESENTATION AND FRAUDULENT CONCEALMENT**

185. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein. This Count is pleaded independently of Plaintiff's contract claims, and is predicated on Defendants' violation of a duty to refrain from deceit that Wisconsin law imposes independently of any contract.

186. The false statements at issue are the monthly electronic remittance reports that WellPartner, LLC generated and transmitted to Plaintiff, and the reimbursement data that Caremark LLC d/b/a CVS Specialty furnished to WellPartner for inclusion in those reports.

187. WellPartner, LLC, the CVS-owned 340B third-party administrator that Defendants required Plaintiff to use, generated and transmitted each remittance report. Caremark LLC d/b/a CVS Specialty supplied the underlying reimbursement figures reported therein. CaremarkPCS Health, LLC generated and transmitted the post-adjudication rate-reduction instructions that made those figures false. CVS Health Corporation, as the common parent that owns and controls each of the foregoing entities, directed and ratified the reporting practice. The individual officers and employees who authorized and implemented the practice are named as John Does 1-15; their identities are presently unknown to Plaintiff because they are within Defendants' exclusive

knowledge and Defendants have refused Plaintiff's audit demand seeking that information.

188. Each remittance report affirmatively represented, in a field denominated "Insurance Paid Amount" or "Program Revenue," that the stated dollar figure was the full amount received from the applicable third-party payor for the identified 340B drug claim, and, in a separate field, that the patient co-pay or co-insurance collected on that claim was $0.00. Both representations were false. The stated reimbursement figure was in fact an artificially depressed post-adjudication "340B rate" that Defendants substituted for the amount actually adjudicated and paid at the point of sale, and patients had in fact paid co-pays and co-insurance calculated on the higher point-of-sale amount.

189. Defendants made these representations on a recurring monthly basis in every remittance cycle from at least January 2020 through the termination of the Agreements in 2026, and on a per-claim basis with respect to each of the thousands of 340B claims reported in each cycle.

190. Each report was transmitted by interstate electronic data transmission from WellPartner's systems in Rhode Island to Plaintiff's systems at its principal place of business in Milwaukee, Wisconsin, and was received there by the personnel in Plaintiff's pharmacy finance and 340B compliance functions who are responsible for reconciling 340B remittances and who reviewed each report in the ordinary course of their duties.

191. As an example of why the statements were false, for an Epclusa prescription (NDC 61958220101) dispensed by CVS Specialty in May 2025, the remittance report transmitted to Plaintiff stated a payor reimbursement of $17,347.31. That figure was false. For an identical Epclusa prescription, in the same quantity, dispensed in the same month, and covered by the same CaremarkPCS-administered plan, Plaintiff received $24,521.33 when the prescription was filled

at a Froedtert Specialty Pharmacy. The $7,174.02 difference is the Spread that Defendants retained and concealed.

192. As another example, for a Lorbrena prescription (NDC 69022701) dispensed by CVS Specialty in May 2025, the remittance report stated a payor reimbursement of $14,011.85. For an identical Lorbrena prescription dispensed in the same month under the same plan and filled at a Froedtert Specialty Pharmacy, Plaintiff received $21,786.77 — a concealed difference of $7,774.92.

193. As an additional example, on August 8, 2022, CVS Specialty, through WellPartner, reported receiving $5,069.99 for 60 units of Xtandi (NDC 469012599), or $84.49 per unit, from a SilverScript Part D plan. SilverScript, itself administered by CaremarkPCS, separately reported to CMS an average monthly unit cost of $121.87 for that same drug in the same quarter — approximately $37 per unit more than the amount CaremarkPCS reported paying its own affiliated pharmacy.

194. Each Defendant's distinct role in the fraud is as follows: (i) CaremarkPCS Health, LLC, operating from Scottsdale, Arizona, adjudicated each claim at the standard national network rate; after WellPartner flagged the claim as 340B-eligible, CaremarkPCS Health, LLC transmitted an electronic instruction reducing the reimbursement to a secret 340B rate, and retained the resulting Spread; (ii) Caremark LLC d/b/a CVS Specialty, operating from Woonsocket, Rhode Island, entered into a secret agreement with CaremarkPCS Health, LLC to reprocess the 340B claims after they were flagged as 340B by WellPartner, and accepted the reduced rate notwithstanding that it thereby reduced its own dispensing fee, and reported the reduced figure, rather than the point-of-sale figure it had originally been paid, to WellPartner for transmission to Plaintiff; (iii) WellPartner, LLC, operating from Woonsocket, Rhode Island, generated and

transmitted to Plaintiff each monthly remittance report stating the reduced figure as the gross insurance payment and stating patient cost-sharing as $0.00; and (iv) CVS Health Corporation, from Woonsocket, Rhode Island, owns and controls each of the foregoing entities, mandated the exclusive use of WellPartner as Plaintiff's 340B third-party administrator, and directed and ratified the rate-reduction and reporting practices with knowledge that the data transmitted to Plaintiff was materially false.

195. Defendants knew these representations were false when made. The reduced 340B rate was generated by CaremarkPCS's own systems and accepted by CaremarkPCS's own affiliated pharmacy; the point-of-sale amount was known to CaremarkPCS because CaremarkPCS itself adjudicated and collected it; and the true patient cost-sharing amount was known to CVS Specialty because CVS Specialty itself collected it from the patient. No Defendant could have reported these figures without knowing they were false.

196. Defendants' concealment of the originally adjudicated point-of-sale payor reimbursement amount was material: had Plaintiff known that CaremarkPCS was receiving materially more from payors than the amount reported to Plaintiff, Plaintiff would not have entered into or continued to perform under the Agreements, would not have paid dispensing fees and third-party administrator fees to Defendants.

197. Independent of any contractual obligation, Defendants owed Plaintiff a duty to disclose the existence and operation of the secret 340B pricing arrangement. The existence of that arrangement was a fact basic to the transaction; and Defendants knew that Plaintiff, as a covered entity with statutory and HRSA compliance obligations that depend on accurate 340B claim and remittance data, would reasonably expect disclosure. Defendants' duty to speak honestly about facts peculiarly and exclusively within their own knowledge arises from law, not from the

Agreements, and would exist even in the absence of any contract between the parties.

198. Plaintiff seeks as fraud damages: (i) the dispensing fees and third-party administrator fees Plaintiff paid to Caremark LLC d/b/a CVS Specialty and WellPartner in reliance on the false remittance reports, which Plaintiff would not have paid had it known the truth; (ii) the 340B savings Plaintiff forwent by routing 340B-eligible prescriptions to CVS Specialty rather than to alternative contract pharmacies that would have remitted at market rates, as demonstrated by the substantially higher amounts Plaintiff realized on identical prescriptions filled through its own specialty pharmacy; (iii) the internal investigative, accounting, and expert costs Plaintiff incurred to detect and quantify the concealed scheme; and (iv) punitive damages, which are unavailable in contract, on account of Defendants' intentional and deliberate deceit.

199. Beyond the recurring remittance reports described above, Caremark LLC d/b/a CVS Specialty and WellPartner separately represented to Plaintiff, in the course of establishing and administering the contract pharmacy relationship, that all reimbursement obtained by Defendants from all sources — including patients and third-party payors — less an agreed-upon dispensing fee, would pass to Plaintiff, and that WellPartner's reporting would accurately capture that reimbursement. Those representations were false when made, because Defendants had already established and were then operating the secret 340B pricing arrangement.

200. As a direct and proximate result of Defendants' fraud, Plaintiff has suffered concrete and ascertainable pecuniary loss, including the categories of damages identified above, in an amount to be determined at trial. Because Defendants' conduct was intentional and in deliberate disregard of Plaintiff's rights, Plaintiff further seeks punitive damages.

**<u>COUNT FOUR</u>**
**CIVIL RICO**
**18 U.S.C. 1962(c)**

201. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

202. The corporate and vertical relationships between CVS Health, CaremarkPCS, Caremark LLC d/b/a CVS Specialty, and WellPartner and their close association in relation to the administration of Plaintiff's 340B drug program, constitute a corporate enterprise as well as an association-in-fact enterprise among CVS Health's corporate entities, pursuant to 18 U.S.C. § 1961(4).

203. The above enterprise maintains an existence separate and apart from the pattern of racketeering activity alleged in this Complaint.

204. The conduct of this enterprise, in relation to the management of Plaintiff's 340B drug claims and remittances of 340B revenue to Plaintiff, is carried out by Defendants CVS Health, CaremarkPCS, Caremark LLC d/b/a CVS Specialty, and WellPartner with a common purpose of depriving profits and revenue from the administration of Plaintiff's 340B Drug Program (the "CVS 340B Enterprise").

<u>Predicate Act 1: 18 U.S.C. § 664</u>

205. 18 U.S.C. § 664, embezzlement from employee benefit plan, makes it unlawful for "any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith."

206. As relevant here, much of the reimbursement for 340B drugs come from self-

funded employee benefit plans that also provide medical and pharmacy benefits to their members.

207. By unlawfully steering and diverting these 340B payments that should be flowing in the ordinary course to Plaintiff to themselves, Defendants violated 18 U.S.C. § 664 by unlawfully converting "to [their] own use" the "fund connected" with a welfare benefit plan, when conducting the affairs of the CVS 340B Enterprise.

Predicate Act 2: 18 U.S.C. § 1954

208. 18 U.S.C. § 1954, offer, acceptance or solicitation to influence operations of employee benefit plan, makes it unlawful for any agent or representative of organizations providing services to an employee welfare benefit plan to, inter alia, receive any "kickback, commission, gift, loan, money, or thing of value" in respect to "any of the actions, decisions, or other duties relating to any question or matter concerning such plan," that exceeds the "bona fide salary, compensation, or other payments" that the agent is owed for its services.

209. Defendants violated 18 U.S.C. § 1954 by accepting "kickback, commission, gift, loan, money, or thing of value" that exceeds the bona fide compensation and fair market value of the Contract Pharmacy services rendered in relation to the administration of Plaintiff's 340B program, when conducting the affairs of the CVS 340B Enterprise.

Predicate Act 3: 18 U.S.C. § 1343

210. 18 U.S.C. § 1343, wire fraud, makes it unlawful for any person having devised, or intending to devise, any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

211. Defendants violated 18 U.S.C. § 1343 by devising and executing a coordinated

scheme to defraud Plaintiff through the use of interstate wire communications. Each use of the interstate wires in furtherance of the fraudulent scheme alleged herein constitutes a separate predicate act of racketeering activity. See 18 U.S.C. §§1961(1)(B), 1961(5).

212. Defendants devised and executed a coordinated scheme to defraud Plaintiff of more than $18 million in 340B Savings and reimbursement revenues to which Plaintiff was contractually and legally entitled under the Pharmacy Services Agreements and HRSA/OPA regulations. The scheme was executed in material part through repeated uses of interstate wire communications, including but not limited to the following:

- *WellPartner Monthly Electronic Remittance Reports*. Since at least January 2020 and occurring monthly thereafter, WellPartner transmitted to Plaintiff, via interstate electronic data transmission, monthly remittance reports for processed 340B drug claims. Those reports were transmitted by means of interstate wire communication from WellPartner's systems in Rhode Island to Plaintiff's systems in Wisconsin. Each report falsely reflected a gross insurance payment to CVS Specialty that was materially less than the amount actually adjudicated and paid by the applicable payor at the point of sale, and falsely reflected a patient co-pay/co-insurance amount of $0.00 on the majority of claims. As a specific example, WellPartner transmitted a remittance report to Plaintiff reflecting a payor reimbursement of $17,347.31 for a Epclusa prescription (NDC 61958220101) dispensed by CVS Specialty in May 2025, when CaremarkPCS had in fact received $24,521.33 from the applicable payor for the identical drug—as confirmed by the $24,521.33 reimbursement Plaintiff received when an identical Epclusa prescription was filed at a Froedtert Specialty Pharmacy in the same month under the same insurance plan.

- *CaremarkPCS Electronic Claims Rate Reduction Transmissions*. Since at least January 2020 and occurring on each occasion a 340B-eligible claim was processed through the CVS 340B scheme, CaremarkPCS transmitted via interstate electronic data interchange (EDI) and/or NCPDP claims processing networks a post-sale electronic adjustment or instruction to CVS Specialty/Caremark LLC directing that the originally adjudicated point-of-sale reimbursement rate be reduced to the artificially depressed 340B rate. These transmissions crossed state lines from CaremarkPCS's systems in Arizona to CVS Specialty/Caremark LLC's systems in Rhode Island (and/or other states). The Spread retained by CaremarkPCS as a result of these transmissions—the difference between the point-of-sale adjudicated amount and the lower 340B reimbursement—is money that belonged to Plaintiff under the Agreements.
- *Internal Coordinating Electronic Communications*. Unidentified CVS Health and CaremarkPCS employees (John Does 1-15) transmitted by email and/or other electronic means via interstate wire communications to recipients including CaremarkPCS, CVS Specialty, and/or WellPartner personnel (John Does 1-15) electronic communications that: (i) established, ratified, and directed the internal policy to reduce reimbursement rates on 340B-identified claims after the point of sale; (ii) directed WellPartner to report only the artificially reduced 340B rates (and not the higher point-of-sale adjudicated amounts) in the remittance data transmitted to Plaintiff; and (iii) directed CVS personnel to refuse Plaintiff's March 2, 2026 audit demand in order to prevent Plaintiff from discovering the full extent of the scheme.

213. Each of the wire transmissions described above was made by means of wire communication in interstate commerce. Each such crossing of state lines in furtherance of the

fraudulent scheme constitutes a separate use of the interstate wires within the meaning of 18 U.S.C. § 1343 and a separate predicate act of racketeering activity.

214. Defendants acted with specific intent to defraud Plaintiff of the 340B Savings. CVS Health publicly warned investors in its SEC filings that reductions in 340B Contract Pharmacy revenues could "materially and adversely affect" CVS Health's financial results, establishing that the retention of 340B Spread was a deliberate and financially significant business decision. CVS Health-affiliated contract pharmacies reported more than $800 million in gross profits from 340B arrangements in 2022-2023. The sophistication and concealment built into the scheme—including using the mandatorily imposed and CVS-owned WellPartner as the exclusive vehicle to generate and transmit false remittance data to Plaintiff, processing the post-sale rate reduction entirely within the CVS Health corporate family and invisible to Plaintiff, refusing Plaintiff's contractually and regulatorily required audit request, and then terminating the Pharmacy Services Agreements in retaliation for Plaintiff's efforts to expose the scheme—is strong evidence of conscious misbehavior and deliberate intent to defraud.

215. The predicate acts of wire fraud described herein constitute a "pattern" of racketeering activity under 18 U.S.C. §§ 1961(1)(B) and 1961(5). These acts have been committed on a continuous and regular basis across thousands of individual 340B drug claims processed per month since 2020, establishing both open-ended continuity (the scheme is ongoing, as evidenced by continued processing of 340B claims after Defendants' retaliatory termination) and closed-ended continuity (the scheme has operated without interruption for more than six years). These predicate acts directly and proximately caused Plaintiff's injury. See 18 U.S.C. § 1964(c).

216. Plaintiff relied on the materially false interstate wire communications described herein to their financial detriment. Specifically, Plaintiff received each WellPartner electronic

remittance report and, relying on its representation that the gross payment reflected therein was the full reimbursement from the applicable payor for 340B-eligible drug claims, accepted the remitted amounts (less the agreed dispensing and TPA fees) as full performance under the Agreements. In reliance on those false reports, Plaintiff continued to perform under the Pharmacy Services Agreements, continued to allow Caremark LLC d/b/a CVS Specialty to serve as Contract Pharmacies, and continued to pay substantial dispensing fees and TPA fees—none of which they would have done had they known the true amounts CaremarkPCS was receiving from payors at the point of sale. Each dispensing fee and TPA fee paid by Plaintiff in reliance on WellPartner's false remittance data constitutes a concrete, out-of-pocket financial loss directly and proximately caused by Defendants' wire fraud.

217. The false reporting of patient co-pay/co-insurance as $0.00 further concealed the true point-of-sale transaction from Plaintiff, depriving them of a critical indicator that would have revealed the discrepancy. As a direct result of relying on the false amounts stated in each wire transmission, Plaintiff received less than the full 340B Savings to which they were entitled on each claim processed.

218. As a direct and proximate result of Defendants' racketeering activities described herein, Plaintiff has suffered significant damages in an amount to be determined at trial.

219. Plaintiff further seeks an injunction pursuant to 18 U.S.C. § 1964(a) to prevent future violations of 18 U.S.C. § 1962 by enjoining Defendants from their discriminatory pricing scheme.

## <u>COUNT FIVE</u>
## BREACH OF CONTRACT VIA THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

220. Plaintiff repeats and reiterates each and every allegation set forth in the prior

paragraphs of this Complaint as if set forth at length herein.

221. Under Wisconsin law, "Every contract implies good faith and fair dealing between the parties to it, and a duty of co-operation on the part of both parties." Metro. Ventures, Ltd. Liab. Co. v. GEA Assocs., 717 N.W.2d 58, 69 (Wis. 2006). "There is an implied undertaking in every contract on the part of each party that he [or she] will not intentionally and purposely do anything to prevent the other party from carrying out his [or her] part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Metro Ventures, 717 N.W.2d at 69.

222. Here, Defendants breached the implied covenant of good faith and fair dealing when Defendants created a secret 340B arrangement under which CaremarkPCS artificially reduced the reimbursement rate for Plaintiff's 340B drugs dispensed by Caremark LLC d/b/a CVS Specialty to 340B-eligible patients of the Covered Entity. Defendants did so intentionally to lower the 340B savings that they would need to pass on to Plaintiff so that they can divert the 340B savings as pure profit to themselves.

223. Additionally, CaremarkPCS, Caremark LLC/CVS Specialty, and WellPartner breached the covenant of good faith and fair dealing by actively concealing their discriminatory 340B pricing scheme, thereby also depriving Plaintiff of the benefit of their bargain.

224. Defendants further breached the covenant of good faith and fair dealing by terminating the Agreements in response to the Covered Entity's exercise of their audit rights under the Agreements consistent with their obligations under 340B Program rules and HRSA regulations. Accordingly, Plaintiff seeks an injunction to enjoin the unlawful and retaliatory terminations of the Agreements.

225. The unlawful and retaliatory terminations further harmed Plaintiff by depriving it

of the 340B savings that would have been generated through the contract pharmacy relationship had the Agreements not been terminated.

226. As a direct and proximate result of Defendants' improper conduct, Plaintiff has suffered significant damages in an amount to be determined at trial.

**COUNT SIX**
**UNJUST ENRICHMENT**

227. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

228. In the alternative, to the extent it is somehow found that the Agreements do not expressly prohibit Defendants from retaining Spread and failing to remit to Plaintiff all payments from patients and third-party payors less the agreed-upon dispensing fee, then Defendants improperly obtained for themselves benefits to which they were not entitled and which it would be unconscionable and otherwise inequitable for them to retain, because the 340B savings were intended by Congress to accrue to the Covered Entity and their patients. See, e.g., Seegers v. Sprague, 236 N.W.2d 227, 230 (Wis. 1975) (defining unjust enrichment as " acceptance and retention by the defendant of the benefit, under circumstances such that it would be inequitable to retain the benefit without payment of the value thereof").

229. As a result of Defendants' having unfairly obtained a benefit to which Plaintiff was in fact entitled, Plaintiff has suffered concrete and irreparable harm as well as significant damages to be determined at trial.

**COUNT SEVEN**
**TORTIOUS INTERFERNECE WITH CONTRACT**

230. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

231. Here, Defendants tortiously interfered with the Agreements between Plaintiff and Caremark LLC by executing the secret 340B arrangement under which CaremarkPCS artificially reduced the reimbursement rate for Plaintiff's 340B drugs dispensed by Caremark LLC/CVS Specialty to 340B-eligible patients of the Covered Entity. As part of that scheme, Defendants caused Caremark LLC/CVS Specialty to accept artificially reduced reimbursement rates after claims were identified as 340B. Defendants did so intentionally to lower the 340B savings that they would need to pass on to Plaintiff under the Agreements, so that they can divert the 340B savings as pure profit to themselves.

232. Defendants further intentionally and improperly interfered with the Agreements by directing WellPartner to falsify the remittance reports provided to Plaintiff that concealed the higher point-of-sale reimbursement and obfuscated the patient out-of-pocket costs—critical datapoints that would have revealed the discriminatory pricing scheme.

233. Defendants further intentionally and improperly interfered with the Agreements by terminating the Agreements in response to the Covered Entity's exercise of its audit rights under the Agreements consistent with its obligations under 340B Program rules and HRSA regulations.

234. Defendants terminated the business agreement as punishment for Plaintiff's exercise of their legal rights under 340B Program rules and HRSA regulations, rather than for legitimate performance or business reasons.

235. The unlawful and retaliatory terminations further harmed Plaintiff by depriving them of the 340B savings that would have been generated through the contract pharmacy relationship had the Agreements not been terminated.

236. As a direct and proximate result of Defendants' tortious interference, Plaintiff has suffered significant damages in an amount to be determined at trial.

## COUNT EIGHT
## BREACH OF CONTRACT RELATING TO THE DENIAL OF AN AUDIT

237. Plaintiff repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

238. At all relevant times, Caremark LLC d/b/a CVS Specialty had a contractual duty to cooperate with Plaintiff's requests to audit the pharmacies' books and records.

239. On March 2, 2026, Plaintiff served on Caremark LLC an audit demand letter setting forth Plaintiff's requests to conduct an audit.

240. Caremark LLC/CVS Specialty has refused Plaintiff's request for access to such books and records.

241. Plaintiff seeks an order enjoining Caremark LLC/CVS Specialty from restricting Plaintiff's access to the pharmacy's books and records and requiring Caremark LLC/CVS Specialty to comply with the audit provisions of the Agreements.

242. Defendants further breached the contractual audit provisions by terminating the Agreements in response to the Covered Entity's exercise of its audit rights under the Agreements consistent with its obligations under 340B Program rules and HRSA regulations. Accordingly, Plaintiff seeks an injunction to enjoin the unlawful and retaliatory terminations of the Agreements.

243. Further, an accounting of Defendants' records is necessary to determine the full extent and amount of Plaintiff's damages and losses resulting from the violations and breaches alleged herein.

**WHEREFORE,** Plaintiff respectfully prays that this Honorable Court enter judgment in its favor and against Defendants as follows:

(a) Declaring that Defendants breached the Pharmacy Services Agreements, violated the Wisconsin Deceptive Trade Practices Act, committed fraud, and violated 18 U.S.C. § 1962

by, among other things, (1) failing to remit to Plaintiff the full amount of reimbursements the Defendants received from third-party payors less the agreed-upon dispensing fee, (2) failing to comply with HRSA and OPA regulations and guidelines regarding contract pharmacy services; (3) depriving Plaintiff of the 340B savings it was entitled to receive due to Defendants' fraudulent pricing scheme; and (4) refusing to cooperate with Plaintiff's reasonable request to audit Defendants' records pursuant to the audit provisions of the Agreements.

(b) Further declaring that Defendants breached their duty of good faith and fair dealing, and/or was unjustly enriched due to the conduct alleged above;

(c) Entering an injunction to prevent future violations of the above;

(d) Entering an injunction to enjoin the unlawful and retaliatory termination of the Agreements;

(e) Awarding Plaintiff all damages adequate to compensate it, such damages to be determined by a jury, including but not limited to treble damages pursuant to the RICO statute and damages for the lost 340B Savings caused by Defendants' unlawful and retaliatory terminations of the Agreements;

(f) Ordering Defendants to disgorge any profits or "Spread" unjustly retained by Defendants from Plaintiff's 340B savings;

(g) Ordering Defendants to provide all accountings necessary to determine the amounts it must remit to Plaintiff to restore losses and to disgorge any profits Defendants unlawfully and unjustly retained;

(h) Awarding Plaintiff prejudgment and post judgment interest as allowed by law;

(i) Awarding Plaintiff its attorneys' fees and all costs of court; and

(j) Awarding Plaintiff any other relief the Court deems just and proper.

**JURY DEMAND**

Pursuant to RULE 38(b) of the FEDERAL RULES OF CIVIL PROCEDURE, Plaintiff demands a trial by jury as to all claims and all issues properly so triable.

Respectfully submitted,

**FRIER LEVITT, LLC**

By: *<u>/s/ Matthew J. Modafferi</u>*
Matthew J. Modafferi, Esq.
Jonathan E. Levitt, Esq.

One World Trade Center
Suite 45E
285 Fulton Street
New York, NY 10007
Telephone: (646) 970-2711

84 Bloomfield Avenue
Pine Brook, NJ 07058
Telephone: (973) 618-1660
Facsimile: (973) 618-0650

*Attorneys for the Plaintiff*

Dated: August 20, 2026